UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| HOWARD J. MEYER, JR., et al., | CASE NO. C17-1218 RSM |
| Plaintiffs, | ORDER |
| v. | |
| BAYERISCHE MOTOREN WERKE AG (aka) BMW MOTORRAD, et al., | |
| Defendants. | |

## I. INTRODUCTION

This matter is before the Court on a motion for summary judgment filed by Defendants Bayerische Motoren Werke AG and BMW of North America, LLC (the "BMW Defendants"). Dkt. #65. The lawsuit, brought by Plaintiffs Howard J. Meyer, Jr., and Darlis L. Elliott, relates to injuries that Mr. Meyer sustained in a motorcycle accident. The motorcycle that Mr. Meyer was riding at the time of the accident was manufactured and sold by BMW Defendants and had been assembled and modified by Defendant DMC Sidecars LLC ("DMC"), most notably to attach a sidecar. BMW Defendants argue that, under Washington law, Plaintiffs may only pursue a product liability claim against BMW Defendants, precluding Plaintiffs' breach of warranty and negligence claims. BMW Defendants further argue that Plaintiffs' product liability claim fails because the testimony of Plaintiffs' own expert witnesses establishes that any manufacturing

ORDER – 1

defect attributable to BMW Defendants was not a proximate cause of Mr. Meyer's accident. DMC does not take a position on the matter and Plaintiffs oppose BMW Defendants' motion. Dkt. #70. Having reviewed the matter, the Court grants BMW Defendants' motion for summary judgment and dismisses Plaintiffs' claims against them.

## II. BACKGROUND

### A. The Motorcycle, Modification, and Mr. Meyer's Accident

Plaintiffs reside in Alaska.[1] Together, they planned on making a motorcycle trek from Alaska to the southern tip of South America. Plaintiffs' trek through Central and South America, as well as their use of the motorcycles at home in Alaska, required that the motorcycles could handle rugged terrain and could be equipped with sidecars. Plaintiffs settled on two R1200 BMW GSA "Adventure" Motorcycles, which they purchased in Alaska. Plaintiffs shipped the motorcycles, in their original shipping crates, to DMC to be assembled and outfitted with DMC "Expedition Sidecars." Presumably at Plaintiffs' request, DMC additionally modified the motorcycles to "lighten" the steering, to accommodate a wider front wheel, and to make the three wheels of the motorcycle and sidecar interchangeable.

DMC's modifications were completed in the summer of 2015 and Plaintiffs traveled to DMC's Washington shop to retrieve the motorcycles. Plaintiffs began driving their motorcycles back home to Alaska, but on their way, and after travelling approximately 2,500 miles, Mr. Meyer experienced shallow depressions in the roadway and the front end of his motorcycle detached from the motorcycle's body. This failure caused Mr. Meyer's motorcycle to veer left across the oncoming lane of traffic, down an embankment, and into the ditch on the side of the roadway.

---

[1] The factual background is not in serious contention for purposes of this motion and the Court sets it forth without citations. The Court's summary is based on Plaintiffs' amended complaint, BMW Defendants' statement of facts in their motion, and Plaintiffs' statement of the relevant facts in its opposition. *See* Dkt. #23 at ¶¶ 9–41; Dkt. #65 at 4–8; and Dkt. #70 at 1–7.

ORDER – 2

1   Similarly, Mr. Meyer was thrown from the motorcycle, across the remainder of the highway,

2   down the embankment, and into the ditch.  Mr. Meyer was badly hurt by the accident and Ms.

3   Elliott, having witnessed the accident and its aftermath, suffered emotional distress.  Mr. Meyer's

4   injuries, which included a fractured hand, a torn rotator cuff, and a torn meniscus, have required

5   multiple surgeries, and will require additional surgeries in the future.

6   **B.  Expert Witness Investigation, Reports, and Deposition Testimony**

7   Following the accident, Plaintiffs retained mechanical engineers Gerald Schaefer and

8   Roland Hoover to independently investigate the accident's cause.  Mr. Hoover is an expert in the

9   manufacturing of aftermarket motorcycle parts, including suspensions, while Mr. Schaefer

10  specializes in "motor vehicle accident reconstruction, failure analysis and the investigation of

11  fires and explosions."  Dkt. #70-2 at 4; Dkt. #70-3 at 17.

12  Following their investigations, each of the experts authored preliminary reports detailing

13  their investigations, findings, and opinions. Dkt. #70-2 at 3–45 (Mr. Hoover's preliminary report

14  and supplemental report on Mr. Meyer's accident); Dkt. #70-3 at 3–25 (Mr. Schaefer's

15  preliminary report).  These reports focused on the causes of the front suspension's failure and its

16  detachment from Mr. Meyer's motorcycle.  The reports largely focus on the modifications made

17  by DMC.  As they related to BMW Defendants' design and manufacturing, the reports focus on

18  a vulnerability identified by BMW Defendants in a 2017 recall.

19  The 2017 recall was issued by BMW Defendants "to address a potential weakness in the

20  design of the [motorcycle's] suspension system."  Dkt. #70-2 at 13.  The recall was issued after

21  BMW Defendants determined that the motorcycle's "fixed fork tube can suffer preliminary

22  damage due to incidents with momentary extreme stress without the user noticing the damage."

23  Nat'l Highway Traffic Safety Admin., U.S. Dep't Transp., Part 573 Safety Recall

24

ORDER – 3

REPORT NO. 17V-438 (2017), available at https://static.nhtsa.gov/odi/rcl/2017/RCLRPT-17V438-8192.PDF.[2]

BMW Defendants subsequently deposed Plaintiffs' experts as to their investigations, reports, and conclusions. BMW Defendants' look past the experts' preliminary reports and base their motion for summary judgment on the deposition testimony of Plaintiffs' experts. Because the experts' testimony and the Court's analysis necessarily focuses on the interactions of the component parts of the motorcycle's front suspension, and for ease of reference, the Court includes a diagram of the motorcycle's front suspension. This diagram represents the front suspension as designed by BMW Defendants and was included in Mr. Hoover's preliminary report.

//

//

//

---

[2] The applicable recall notice does not appear to be included in the record. Plaintiffs attach a recall notice issued in Canada. That recall indicates that

> [o]n certain motorcycles, the threaded plugs which secures the front fork tubes to the upper triple clamp may loosen over time. This could allow a fork tube to detach, which could result in a sudden loss of steering control and a crash causing property damage and/or personal injury. Correction: Dealers will crimp-lock the fork tube threaded plugs.

Dkt. #70-1 at 37. Mr. Hoover's report relies on an unattributed quote:

> The recall details the following: "*As a result of ongoing field observations, BMW Motorrad has determined that the fixed fork tube (stanchion) of the R 1200 GS (K50, K50/11) and R 1200 GS Adventure (K51) can be damaged due to unusual incidents. Such high stress can be caused for example, when riding over an obstacle, during a fall or when driving through deep potholes. Resulting damage to the stanchion manifests itself through a gap between the stanchion and the press-fitted, top seal plug.*"

Dkt. #70-2 at 13 (italics in original).

ORDER – 4



FIGURE 7: The BMW Telelever System components

See Dkt. #70-2 at 12.

### III.   DISCUSSION

**A. Legal Standard for Summary Judgment**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Material facts are those which might affect the outcome of the suit under governing law.  *Anderson*, 477 U.S. at 248.  In ruling on summary judgment, a court does not weigh evidence to determine the truth of the matter, but "only determine[s] whether there is a genuine issue for trial."  *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994) (citing *Fed. Deposit Ins. Corp. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir. 1992)).

On summary judgment, the Court views the evidence and draws inferences in the light most favorable to the non-moving party.  *Anderson*, 477 U.S. at 255; *Sullivan v. U.S. Dep't of*

ORDER – 5

1  *the Navy*, 365 F.3d 827, 832 (9th Cir. 2004).  However, where the non-moving party fails to
2  properly support an assertion of fact or fails to properly address the moving party's assertions of
3  fact, the Court will accept the fact as undisputed.  FED. R. CIV. P. 56(e).  "The mere existence of
4  a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there
5  must be evidence on which the jury could reasonably find for the [non-moving party]."
6  *Anderson*, 477 U.S. at 251.  As such, the Court relies "on the nonmoving party to identify with
7  reasonable particularity the evidence that precludes summary judgment."  *Keenan v. Allan*, 91
8  F.3d 1275, 1278–79 (9th Cir. 1996) (quotation marks and citations omitted).

**B.  Plaintiffs' Washington Product Liability Act Claims**

**1.  Manufacturer Liability Under Washington's Product Liability Act**

Washington's Product Liability Act ("PLA") creates a broad cause of action encompassing "any claim or action brought for harm caused by the manufacture, production, making, construction, fabrication, design, formula preparation, assembly, installation, testing, warnings, instructions, marketing, packaging, storage or labeling of the relevant product." WASH. REV. CODE § 7.72.010(4).  A product liability claim can be brought against a product manufacturer where a "claimant's harm was proximately caused by the negligence of the manufacturer in that the product was not reasonably safe as designed."  *Id.* § 7.72.030(1).[3]  A manufacturer's product is "not reasonably safe as designed, if, at the time of manufacture, the likelihood that the product would cause the claimant's harm or similar harms, and the seriousness of those harms, outweighed the burden on the manufacturer to design a product that would have prevented those harms and the adverse effect that an alternative design that was practical and

---

[3] Washington's PLA also imposes liability on "product sellers."  But a product seller's liability is only implicated if it is not also the manufacturer of the product sold and in other situations not implicated here.  *See generally* WASH. REV. CODE § 7.72.040.  Neither party argues that product seller liability warrants consideration.

ORDER – 6

feasible would have on the usefulness of the product." *Id.* § 7.72.030(1)(a). Washington courts employ two tests to determine whether a product was reasonably safe as designed, a risk-utility test and a consumer expectations test. *Bruns v. PACCAR, Inc.*, 77 Wash. App. 201, 210, 890 P.2d 469, 474 (1995).

### 2. Defects Present in BMW Defendants' Motorcycles at the Time of Manufacture

In arguing that BMW Defendants' motorcycles were defective at the time of their manufacture, Plaintiffs do not clearly adopt the risk-utility test or the consumer expectations test. Plaintiffs' complaint appears to adopt the consumer expectations theory of reasonable safety as the basis for their product liability claim. *See* Dkt. #23 at ¶ 69 ("the BMW motorcycles purchased by the Plaintiffs, were not reasonably safe for their foreseeable use as would be contemplated by the ordinary consumer"). But Plaintiffs also argue that alternative designs were available to BMW Defendants which could have mitigated the risk of Mr. Meyer's accident without compromising the utility of the motorcycles. The lack of clarity weakens Plaintiffs' arguments, but the Court does not belabor the distinction as this matter is more appropriately resolved under a proximate cause analysis, as discussed further below. Nevertheless, several points warrant discussion.

Plaintiffs primarily attempt to establish that the motorcycles were not reasonably safe as manufactured based on BMW Defendants' 2017 recall of the motorcycles. As previously noted, the 2017 recall identified, after Mr. Meyer's accident, a vulnerability in the "press-fit and crimp connection" between the stanchion tubes and the top cap plugs—the top cap plugs attach the fork and stanchion tubes to the fork steering bridge. Plaintiffs maintain that the use of a press-fit crimp connection rendered the motorcycle defective. Dkt. #70 at 10. In doing so, Plaintiffs focus

ORDER – 7

on the conclusions set forth in Mr. Hoover's and Mr. Shaefer's preliminary reports.[4]  Mr. Hoover's preliminary report, for instance, concludes that "[t]he weak crimp compromise[d] the integrity of [the front suspension] and [] contributed to the failure of Meyer's [f]orks causing the crash."  Dkt. #70 at 4 (quoting Dkt. #70-2 at 13).

Plaintiffs seek further support from BMW Defendants' subsequent correction of the "weak crimp" connection.  More specifically, Plaintiffs point out that after BMW Defendants determined that the stanchion tube-top cap plug connection could separate, affecting "handling and stability of the motorcycle," they reinforced the connection with the addition of a metal "sleeve" or "collar."  *Id.* at 10.  In this regard, Plaintiffs invoke a risk-utility approach, arguing that alternative designs were originally available to BMW Defendants which could have strengthened the stanchion tube-top cap plug connection without interfering with the front suspension's utility.  Plaintiffs rely primarily on Mr. Schaefer's testimony that the addition of this metal sleeve "stiffened up the connection between the top of the fork tubes and the steering bridge," allowing it to handle increased loads without failing.  Dkt. #70-1 at 48–49 (Schaefer Dep. 142:9–143:23).

Plaintiffs pivot back to the consumer expectations approach, relying on Mr. Schaefer's opinion that the vulnerable connection could fail under "foreseeable loads under expected use of the motorcycle."  Dkt. #70 at 5.  To support this opinion, Mr. Schaefer relies on BMW Defendants' marketing of the motorcycles "expressly for use off-road, using the word 'enduro'"

---

[4] Outside of their experts' reports, Plaintiffs point to a single page of deposition testimony—Mr. Hoover's—in support of their argument. Dkt. #70 at 4 n.7 (citing Dkt. #70-1 at 44). While the basis for the citation is somewhat unclear the Court assumes that Plaintiffs rely on BMW Defendants' subsequent decision to "beef up" the stanchion tube-top cap plug connection by adding a "collar." Dkt. #70-1 at 44 ("That collar strengthens the material thickness of the stanchion tube in the area where it's crimped onto the top cap, in order to provide more resistance to pulling out.").

ORDER – 8

1  and their use of photographs to convey that the motorcycles were suitable for use in rugged
2  terrains. *See id.* (quoting Dkt. #70-3 at 13).

3  BMW Defendants take issue with Plaintiffs' arguments on several bases. They point out
4  that Plaintiffs' arguments have improperly focused on the motorcycle at the time of the accident,
5  necessarily after the time of manufacture and after the motorcycle was modified by DMC. Dkt.
6  #71 at 3–6. BMW Defendants argue that such an approach conflicts with Washington law and
7  would expose BMW Defendants to countless product liability claims premised on changes
8  occurring after the time of manufacture and sale. *Id.* Still further, BMW Defendants argue that
9  Plaintiffs' arguments gloss over the deposition testimony of their experts, ignore proximate cause
10 issues, and credit the experts' preliminary reports[5] and their general opinions over contrary
11 deposition testimony. *Id.* at 6–7. And lastly, BMW Defendants object to Plaintiffs' reliance on
12 subsequent remedial measures to support their argument that the motorcycle was defective as
13 manufactured. Dkt. #65 at 13–14; . Indeed, the Washington Supreme Court has held that "[t]he
14 introduction of evidence of subsequent remedial modifications may confuse the jury by diverting
15 its attention from whether the product was defective at the time the product was manufactured to
16 some later point in time." *Hyjek v. Anthony Indus.*, 133 Wash. 2d 414, 428, 944 P.2d 1036, 1042
17 (1997).

18 However, this matter is best resolved on the issue of proximate cause and the Court leaves
19 the issue of possible defects unresolved.

---

[5] The Court notes that Plaintiffs did not submit substantive declarations from their experts in opposition to BMW Defendants' motion for summary judgment. Rather, the experts submitted declarations, under penalty of perjury, declaring that the preliminary reports attached to their declarations "contain [their] expert opinions in this matter." Dkt. #70-2 at 2, ¶ 4; Dkt. #70-3 at 2, ¶ 4. The experts' preliminary reports were not sworn under penalty of perjury and it is unclear whether Plaintiffs' experts are merely "authenticating" their reports or adopting their reports as sworn testimony, creating ambiguity and otherwise unexplored evidentiary issues.

ORDER – 9

### 3. Proximate Cause in Product Liability Actions

At bottom, BMW Defendants' motion for summary judgment contests liability on the basis that even if the vulnerable stanchion tube-top cap plug connection was a product defect, the defect was not the proximate cause of Plaintiffs' damages.

Washington law provides that "[a] user or consumer may be barred from recovery if the product undergoes substantial change in its condition after leaving the manufacturer." *Parkins v. Van Doren Sales, Inc.*, 45 Wash. App. 19, 28, 724 P.2d 389, 395 (1986) (citing *Padron v. Goodyear Tire & Rubber Co.*, 34 Wash. App. 473, 476, 662 P.2d 67, *review denied*, 100 Wash.2d 1003 (1983); *Bich v. General Elec. Co.*, 27 Wash. App. 25, 29, 614 P.2d 1323 (1980)). Often, summary judgment on proximate causation is not appropriate because of genuine disputes on material questions of fact as to whether the modifications were substantial. *See e.g.*, *Frye v. Biro Mfg. Co.*, Case No. 10-cv-192-JCC, 2011 WL 1362537, at *3 (W.D. Wash. Apr. 11, 2011) (summary judgment denied because of question of fact as to whether the modification of the product was substantial); *Bich*, 27 Wash. App. at 29–30, 614 P.2d at 1326 (noting that manufacturer, GE, supported its theory that "but for the substitution of fuses, the accident would not have occurred" with expert testimony and consumers' conflicting testimony that "it was acceptable practice to interchange GE and Westinghouse fuses" and concluding that "[w]hether the substitution was a substantial change is a question of fact"). But courts "may resolve the issue of proximate cause as a matter of law when no reasonable persons would differ." *Frye*, 2011 WL 1362537, at *3 (citing *Anderson v. Weslo, Inc.*, 79 Wash. App. 829, 906 P.2d 336, 341 (Wash. Ct. App. 1995)).

### 4. DMC's Modifications Were the Proximate Cause of Plaintiffs' Harm

Plaintiffs and BMW Defendants are in general agreement that DMC substantially modified the motorcycles from their manufactured form. *See* Dkt. #70 at 6 (Plaintiffs

ORDER – 10

characterizing DMC's modifications as "not insubstantial"). Nevertheless, Plaintiffs maintain that these modifications merely exacerbated the defect identified by BMW Defendants in their 2017 recall and that the defect played a significant part in causing Mr. Meyer's accident. *See id.* at 5–6 (arguing that Plaintiffs' experts concluded that "the weak fork crimp connection designed by BMW [Defendants] combined with the ill-advised modifications to the suspension by DMC to cause the catastrophic disconnection of the front suspension" during Mr. Meyer's accident). On the other hand, BMW Defendants argue that even if the BMW motorcycles, as manufactured, were not reasonably safe due to the stanchion tube-top cap plug vulnerability, this defect was not a proximate cause of Mr. Meyer's accident. Dkt. #71 at 1–3. Having considered the evidence, and primarily the testimony of Plaintiffs' own experts, the Court finds that summary judgment in favor of BMW Defendants is appropriate.

Plaintiffs' experts both describe DMC's modifications as akin to a "redesign" of the front suspension. *See* Dkt. #65-1 at 30 (Schaefer Dep. 90:20–92:4); *id.* at 61 (Hoover Dep. 58:2–5, 60:7–12). At a minimum, DMC "added an adapter plate underneath the fork steering bridge[,] . . . . "replaced the ball joint with a different unit, from a different model year[,] . . . . changed the lower triple clamp[,] . . . . [and] changed the axle." *Id.* at 61 (Hoover Dep. 58:18–22).

These changes had a significant effect on the suspension designed and manufactured by BMW Defendants. For instance, Mr. Hoover noted that "the suspension's requirement to have a flex point for motion under travel" was constrained by DMC's addition of the adapter plate holding the fork tubes further apart to accommodate a wider wheel. Dkt. #70-2 at 18. This adapter plate limited "movement of the bushing joint,[6] which increase[d] the bending stress in the stanchion" and put "the top cap into a misaligned and binding condition." *Id.* Likewise, Mr.

---

[6] The bushing joint is contained within the fork steering bridge at the point that the top cap plug is connected to the fork steering bridge. *See* Dkt. #70-2 at 13.

ORDER – 11

Schaefer opined that DMC's "redesign of the front suspension removed a critical aspect of the operation of the [BMW-manufactured] suspension by constraining rotation about the horizonal axis at the point where the fork plug attached to the . . . adapter plate," leading "to the rapid failure of the front suspension." Dkt. #70-3 at 15. Mr. Schaefer further notes that the loss of "[a] necessary degree of freedom in the joint between the fork plugs and steering bar . . . directly precipitated" the failure of Mr. Meyer's front suspension. *Id.* at 3.

More damaging, Plaintiffs' experts agree that BMW Defendants' motorcycle, as designed and manufactured, would not have failed in the manner that they believe Mr. Meyer's motorcycle did. Mr. Schaefer attributes the failure to the addition of the adapter plate by DMC and testified that the "failure [could not] occur with [BMW Defendants'] original design" of the front suspension. Dkt. #65-1 at 37 (Schaefer Dep. 118:7–119:5). He further indicated his belief that the motorcycle, had it been unmodified from BMW Defendants' design, would have handled the conditions at the time of Mr. Meyer's crash "without even blinking." *Id.* at 41 (Schaefer Dep. 134:5–19) (indicating that conditions experienced were "severe" for DMC-modified suspension but not for BMW Defendants' suspension as designed and manufactured). Similarly, Mr. Hoover testified that the motorcycle as designed and manufactured by BMW Defendants was unlikely to fail because of the potholes experienced by Mr. Meyer, as those conditions would be expected to be "within the capability of the motorcycle and its suspension." *Id.* at 73–74 (Hoover Dep. 109:23–110:24).

Despite this testimony, Plaintiffs argue that because the motorcycles were vulnerable to developing a separation between the stanchion tube and top cap plugs, this vulnerability was necessarily a proximate cause of the suspension's failure. Dkt. #70 at 11–12. But Plaintiffs fail to adequately support their argument. Plaintiffs rely only on the preliminary reports of their expert witnesses, ignoring their later deposition testimony. Similarly, Plaintiffs fail to cite to any

ORDER – 12

1    cases supporting their argument that the stanchion tube-top cap plug vulnerability should be
2    treated as a legal proximate cause here.  Rather, Plaintiffs rehash many of their earlier arguments.
3        Plaintiffs attempt to argue, as a matter of public policy, that BMW Defendants should be
4    held liable because they promoted their motorcycles for off-road use and knew that many
5    motorcycles would be modified, some by the attachment of sidecars. *Id.* at 12–13.  Plaintiffs
6    argue that Mr. Meyer's use of his motorcycle was foreseeable, and that the stanchion tube-top
7    cap plug vulnerability should be considered a proximate cause of Mr. Meyer's accident because
8    BMW Defendants permitted the vulnerable connection to remain unsecured.  Essentially,
9    Plaintiffs argue that the accident was proximately caused by BMW Defendants' failure to design
10   a front suspension that would not fail in the circumstances encountered by Mr. Meyer.
11       But again, Plaintiffs overlook the modifications made by DMC.  Plaintiffs do not establish
12   that any industry standard applies to the way sidecars are attached to motorcycles or that BMW
13   Defendants were involved in DMC's modification of the motorcycle.  BMW Defendants could
14   not reasonably anticipate the way DMC would attach its sidecar to their motorcycle and could
15   not account for that in their design and manufacturing.  In this sense, Plaintiffs seek to hold BMW
16   Defendants responsible for knowing the designs of every after-market component marketed for
17   use with BMW Defendants' motorcycles.  But this conflicts with Washington law, which
18   provides that "component sellers are not liable when the component itself is not defective"
19   because liability would otherwise "require the component seller to develop sufficient
20   sophistication to review the decisions of the business entity that is already charged with
21   responsibility for the integrated product." *Sepulveda-Esquivel v. Cent. Mach. Works, Inc.*, 120
22   Wash. App. 12, 19, 84 P.3d 895, 898 (2004); *see also Simonetta v. Viad Corp.*, 165 Wash. 2d
23   341, 353, 197 P.3d 127, 133 (2008) (in product liability context, a manufacturer's duty to warn
24   of risks should not extend to "another manufacturer's product").

ORDER – 13

Under the facts of this case, BMW Defendants are akin to component sellers. They designed and manufactured a product for stand-alone use as a motorcycle. Plaintiffs' experts testify that they would not expect the front suspension of the motorcycle, as designed, to fail under the conditions encountered by Mr. Meyer. To some extent, DMC's modifications turned BMW Defendants' motorcycle into a "component part" of DMC's motorcycle-and-sidecar "product." *See Simonetta*, 165 Wash. 2d at 353, 197 P.3d at 133 ("The court can find no case law that supports the idea that a manufacturer, after selling a completed product to a purchaser, remains under a duty to warn the purchaser of potentially defective additional pieces of equipment that the purchaser may or may not use to complement the product bought from the manufacturer.") (quoting *In re Deep Vein Thrombosis*, 356 F. Supp. 2d 1055, 1067–68 (N.D. Cal. 2005)).

Plaintiffs attempt to establish that BMW Defendants had notice of the modifications made by DMC to their motorcycles because of an article in "BMW Motorcycle Magazine" featuring a BMW motorcycle modified by DMC to attach a sidecar. Dkt. #70 at 10–11 (citing Dkt. #70-1 at 38–41). From this, Plaintiffs argue that BMW Defendants should have accounted for this specific type of modification in its design and manufacture and that their failure was a proximate cause of the accident. But BMW Defendants rebut the argument by submitting the declaration of their corporate representative, Mark R. Yeldham, establishing that the magazine "is *not* a publication of the BMW [D]efendants in this matter," that BMW Defendants "did not write, review, or control what was written and published in" the magazine, and that BMW Defendants were otherwise "unaware" of the article prior to Plaintiffs' lawsuit. Dkt. #71-1 at ¶ 2 (emphasis in original). As such, Plaintiffs cannot establish that BMW Defendants knew of the way DMC was altering their motorcycles such that they were negligent in their design and manufacture of the motorcycle's front suspension.

ORDER – 14

Finally, Plaintiffs are left to argue that their experts' deposition testimony "did not cover all of the opinions of Plaintiff's [sic] experts" and did not cover "the expert's [sic] opinions that the crimped fork connection was a factor in the suspension separation." Dkt. #70 at 6. Nevertheless, Plaintiffs do not point to any specific opinions held by their experts, making Plaintiffs' opposition far more notable for its omissions.[7] Plaintiffs do not point to any deposition testimony to explain the asserted discrepancy between the experts' preliminary reports and their deposition testimony. Plaintiffs do not provide declarations explaining why BMW Defendants' interpretation of the testimony was erroneous. In fact, Plaintiffs do not point to any specific language[8]—either from deposition transcripts, declarations, or preliminary reports—supporting their argument that Mr. Hoover and Mr. Schaefer found the stanchion cap defect was a proximate cause of Mr. Meyer's accident. And finally, Plaintiffs do not point to any similar cases where a manufacturer was held to account for substantial post-manufacture modifications made by a third party. In short, Plaintiffs have not demonstrated "that there is [a] genuine dispute as to any material fact," and BMW Defendants are "entitled to judgment as a matter of law. FED. R. CIV. P. 56(a).

---

[7] Plaintiffs also did not contest BMW Defendants' characterizations of deposition testimony. *See* Dkt. #65 at 2–3, 5–8 (summarizing deposition testimony detailing Defendant DMC's substantial changes to the front suspension designed and manufactured by BMW Defendants).

[8] The most specific language Plaintiffs rely on to support their argument is Mr. Hoover's discussion of the stanchion top cap vulnerability that led to the recall. *See* Dkt. #70 at 4 (quoting Dkt. #70-2 at 13). After detailing the stanchion tube cap vulnerability, Mr. Hoover noted that "[t]he stanchion tube crimp is among the components in the suspension system that keeps the front wheel in place and attached to the motorcycle. The weak crimp compromises the integrity of that system and has contributed to the failure of Meyer's [f]orks causing the crash." Dkt. #70-2 at 13. But even if this generalized conclusion could support Plaintiffs' argument, it is contradicted by Mr. Hoover's later deposition testimony which makes clear that the failure of the suspension was due to the modifications made by DMC.

ORDER – 15

### C. Negligence and Breach of Warranty Claims

Plaintiffs' complaint also asserts claims based on theories of negligence and breach of warranty. *See* Dkt. #23 at ¶¶ 42–63, 73–75. BMW Defendants seek dismissal of these claims on the basis that they are preempted by the Washington PLA's product liability cause of action. Washington law specifies that statutory product liability claims include

> any claim or action previously based on: Strict liability in tort; negligence; breach of express or implied warranty; breach of, or failure to, discharge a duty to warn or instruct, whether negligent or innocent; misrepresentation, concealment, or nondisclosure, whether negligent or innocent; or other claim or action previously based on any other substantive legal theory except fraud, intentionally caused harm or a claim or action under the consumer protection act, chapter 19.86 RCW.

WASH. REV. CODE § 7.72.010(4). Plaintiffs concede that these claims have been subsumed by their statutory product liability claim. *See* Dkt. #70 at 10 (noting that "[t]he Washington Products Liability Act (WPLA) preempted common law theories of negligence in product liability claims, and created a single cause of action for product-related harms") (citing *Luttrell v. Novartis Pharmaceuticals Corp.*, 894 F. Supp. 2d 1324 (E. D. Wash. 2012), *aff'd*, 555 Fed.App'x. 710 (9th Cir. 2014)). The Court accordingly dismisses these claims.

### D. BMW Defendants' Motions in Limine

Lastly, BMW Defendants filed a motion in limine to exclude evidence of its prior recalls related to its motorcycles concurrently with their motion for summary judgment. Dkt. #66. BMW Defendants make clear, however, that their summary judgment motion "does not depend on" the issues raised in their motion in limine. Dkt. #66 at 2. Rather, BMW Defendants specify that they are filing the motion in limine before the Court's deadline for filing such motions, "because some of the same technical and engineering issues underlie both [m]otions." *Id.* More recently, and in anticipation of the upcoming trial date, BMW Defendants filed another motion in limine seeking to exclude certain other evidence. Dkt. #74. Having already determined that

ORDER – 16

Plaintiffs' claims against BMW Defendants are subject to summary judgment and dismissal, the Court need not consider the pending motions in limine and denies the motions as moot.

## IV.  CONCLUSION

Accordingly, and having considered BMW Defendants' motion, the briefing of the parties, the evidence submitted in support of the briefing, and the remainder of the record, the Court finds and ORDERS:

1. BMW Defendants' Motion for Summary Judgment (Dkt. #65) is GRANTED. All of Plaintiffs' claims asserted against Defendants Bayerische Motoren Werke AG and BMW of North America, LLC in Plaintiffs' Amended Complaint for Personal Injury and Property Losses (Dkt. #23) are DISMISSED with prejudice.

2. Defendants BMW AG's and BMW NA's Motion in Limine to Exclude Evidence of Recalls (Dkt. #66) is DENIED as moot.

3. Defendants BMW AG's and BMW NA's Motion in Limine to Exclude Certain Evidence (Dkt. #74) is DENIED as moot.

DATED this 15th day of December, 2021.

RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE

ORDER – 17